Donna MILLER, individually and as Administratrix of the Estate of Charles Miller, Plaintiff,

v.

SMS SCHLOEMANN-SIEMAG, INC., Defendant.

No. CIV.A.2:00-0896.

United States District Court, S.D. West Virginia, Charleston Division.

May 15, 2002.

Guy R. Bucci, Esquire, Timothy C. Bailey, Bucci Bailey & Javins L.C., Charleston, WV, for Plaintiff.

Arnd N. von Waldow, Douglas E. Cameron, Reed Smith Shaw & McClay, LLP, Pittsburgh, PA, for Defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Prior to removal, Plaintiff Donna Miller, in her individual and representative capacity, filed a seven hundred (700) page packet of material containing the briefing, record, and hearing transcript relating to the motion to dismiss for lack of personal jurisdiction asserted by Defendant SMS Scholemann–Siemag Inc. (SMS) in state court.

After conducting a careful review of the materials, along with the additional briefing submitted by both parties, the Court **FINDS** and **CONCLUDES** Plaintiff has made a *prima facie* showing to support the exercise of personal jurisdiction. Accordingly, the Court **DENIES** the motion for dismissal based on *Rule* 12(b)(2), *Federal Rules of Civil Procedure.*

## I. FACTUAL BACKGROUND

In 1996, SMS, a Pennsylvania corporation, contracted with Hyundai Industries, Co., Ltd. (Hyundai) to design, build, and install a continuous steel casting machine for Dongkuk Steel Mill Ltd. (Dongkuk) in South Korea. The contract was negotiated and signed in Pennsylvania and South Korea. Neither the design, manufacture, nor any part of the performance of that contract, took place in West Virginia.

SMS entered subcontracts with other entities to facilitate the project. One subcontractor was Industrial Controls and Engineering, Inc. (ICE), which provided the machine's instrumentation. ICE later subcontracted with AIG. AIG was hired to resolve instrument calibration anomalies at the Dongkuk facility. Neither ICE nor AIG appear to be West Virginia corporations. AIG contracted with BAS Technical Employment Placement Company (BAS), a West Virginia corporation, to actually perform the work. BAS, in turn, employed Plaintiff's decedent, Charles Miller. Before hiring Miller, however, a BAS employee drove him from West Virginia to Pennsylvania for a meeting with SMS representatives. An SMS official, along with others, participated in the interview. Eventually, Miller was dispatched by BAS to the Dongkuk facility. On December 28, 1997 Miller was performing repairs at the Dongkuk steel casting factory. A malfunction occurred during the manufacturing process causing molten steel to spill, melt through a blower fan assembly, and pour onto Miller. Miller attempted to put out the flames burning his flesh by rolling on the floor and using two nearby fire extinguishers. Neither worked. His clothes were burned off by the time Brett Christman, an SMS employee, located him on a stairwell. Miller suffered burns to over 2/3 of his body.

Mr. Miller was taken to several South Korean hospitals. Concerned with the level of care he was receiving, Plaintiff Donna Miller requested her husband be transported to a critical care burn unit in the United States. Her requests to SMS for help were refused. Later, however, an SMS official presented Mrs. Miller a written proposal in her hotel room. SMS agreed to pay the cost of transport provided the Millers promised, *inter alia,* not to treat the transport as an SMS admission of liability for the accident. Mrs. Miller's affidavit explains:

> Under the extreme duress of the circumstances in which I found myself, and without any alternative I signed the SMS ... document so that my husband, Charles Miller, would be transported to the United States to receive proper treatment in a critical care burn treatment center equipped and staffed to treat his life-threatening third degree burns which covered over sixty-eight (68%) of his body ....

(Aff. of Donna Miller ¶ 11.) Unfortunately, Mr. Miller died of his injuries after returning to the United States.

In November 1999 the widowed Plaintiff instituted this action against BAS and SMS in the Circuit Court of Kanawha County. She alleged a deliberate-intention claim against BAS pursuant to *West Virginia Code* Sections 23–4–2(b) and (c)(2)(ii), asserting BAS "took no steps to ensure safe work environments would be provided for its employees" at its assigned jobs. (Compl. ¶ 8.)

Compared with the clarity of her claim against BAS, however, her claims against SMS are somewhat vague. First, the style of the case reads, in part, "DONNA MILLER, individually *and* as Administratrix of the ESTATE OF CHARLES MILLER." (Compl. at 1 (emphasis added).) Second, Count IV reads:

56. Plaintiff realleges paragraphs 1 through 27 in Count IV of her Complaint.

57. The actions of the defendant SMS in requiring Donna Miller to execute under duress a release of claims before transporting the decedent Charles Miller to appropriate medical facilities is of such an outrageous and unconscionable nature as to shock the reasonable person. As such, this wilful and wanton conduct is of a nature to allow an award of punitive damages against defendant SMS.

(*Id.* ¶¶ 56 and 57.) Some of the incorporated allegations include:

19. Decedent Charles Miller was transported to various hospitals in [South] Korea where the conditions, including sterility of the facility and the qualifications of physicians, caused grave concern to decedent's wife, Donna Miller.

20. After repeated requests that her husband be transported to the United States for the best care given his horrific injuries, defendants agreed to pay for the substantial cost of such transportation only if Donna Miller signed a release of claims related to her husband's injuries.

21. Under duress and the extraordinary circumstances under which Donna Miller found herself, without advice or aid of counsel, she executed a release as the only means to have her husband transported to a reputable burn center in the United States.

(*Id.* ¶¶ 19–21.)

Prior to removal, SMS had pending before the Circuit Court of Kanawha County a motion to dismiss for lack of personal jurisdiction. As noted, the briefing was extensive.[1] After some time, Judge King's secretary informed the parties Plaintiff should submit a proposed Order denying the motion to dismiss. While the proposed Order was awaiting Judge King's signature, SMS removed.[2]

---

1. The state judge commented on the voluminous briefing now being reconsidered by this Court. The following exchange took place between the Honorable Charles E. King, Jr. and Efrone Grail, counsel for SMS:

MR. GRAIL: ... I'll try and be brief. The Court has a fair amount of papers in front of it.

THE COURT: As a matter of fact, sir, this may set the record for a motion to dismiss. (Trans. of hrg. at 5.) The parties submitted additional briefing following the hearing. In keeping with its complex history in state court, the case has generated two published decisions from this Court, not including the instant Memorandum Opinion.

2. Plaintiff moved to remand, denying BAS was fraudulently joined. The Court disagreed and dismissed BAS as a party:

Taking all factual and legal considerations in Plaintiff's favor, there is no possibility she could establish a deliberate-intention claim [against BAS]. In short, she has failed

## II. DISCUSSION

### A. Governing Standard

Since no decision had been entered by Judge King prior to removal, the Court has reviewed the entire record submitted by the parties *de novo.*

One applicable long arm statute[3] is found in *West Virginia Code* Section 31–1–15. Section 31–1–15 provides:

> Any foreign corporation which shall conduct affairs or do or transact business in this state without having been authorized so to do pursuant to the provisions of this article shall be conclusively presumed to have appointed the secretary of state as its attorney-in-fact with authority to accept service of notice and process on behalf of such corporation and upon whom service of notice and process may be made in this state for and upon every such corporation in any action or proceeding described in the next following paragraph of this section. . . .
>
> For the purpose of this section, a foreign corporation not authorized to conduct affairs or do or transact business in this state pursuant to the provisions of this article shall nevertheless be deemed to be conducting affairs or doing or transacting business herein (a) if such corporation *makes a contract to be performed,* in whole or *in part, by any party thereto, in this state,* [or] (b) if such corporation *commits a tort, in whole or in part, in this state* . . . . *The making of such contract* . . . *[or] the committing of such tort* . . . *shall be*

> deemed to be the agreement of such corporation that any notice or process served upon, or accepted by, the secretary of state pursuant to the next preceding paragraph of this section in any action or proceeding against such corporation arising from, or growing out of, such contract [or] tort . . . shall be of the same legal force and validity as process duly served on such corporation in this state.

*Id.* (emphasis added).

In *In re Celotex Corp.,* 124 F.3d 619 (4th Cir.1997), the Court of Appeals discussed the standards for determining whether a defendant is subject to personal jurisdiction:

> In order for a court to validly exercise personal jurisdiction over a non-resident defendant: (1) a statute must authorize service of process on the non-resident defendant, and (2) the service of process must comport with the Due Process Clause. *Because the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula for determining the existence of personal jurisdiction. Rather, the statutory inquiry necessarily merges with the Constitutional inquiry.* . . .

A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend its interests in the forum does not "offend

---

conclusively to make any showing or prediction BAS "had a subjective realization and an appreciation of the existence of . . . [a] specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by such specific unsafe working condition."

*Miller v. BAS Technical Employment,* 153 F.Supp.2d 835, 838 (S.D.W.Va.2001).

**3.** *See* and *compare* W. Va.Code § 56–3–33; *Harman v. Pauley,* 522 F.Supp. 1130 (N.D.W.Va.1981); *Hill by Hill v. Showa Denko, K.K.,* 188 W.Va. 654, 425 S.E.2d 609 (1992).

'traditional notions of fair play and substantial justice.'" Later cases have clarified that the minimum contacts must be "purposeful." This "purposeful" requirement rests on the basic premise that traditional notions of fair play and substantial justice are offended by requiring a non-resident to defend itself in a forum when the non-resident never purposefully availed itself of the privilege of conducting activities within the forum, thus never invoking the benefits and protections of its laws. Moreover, this "purposeful" requirement "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum."

When, as here, a court's power to exercise personal jurisdiction over a non-resident defendant is challenged by a motion under Federal Rule of Civil Procedure 12(b)(2), "the jurisdictional question thus raised is one for the judge, with the burden *on the plaintiff ultimately* to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Furthermore, when, as here, a district court rules on a Rule 12(b)(2) motion *without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge."* "In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."

*Id.* at 627–28 (citations and quoted authority omitted).

Likewise, this Court has discussed a plaintiff's burden at this stage of the case:

The burden plaintiff bears to establish the court's jurisdiction *normally is not a heavy one, particularly where the court chooses to rule on the issue without an evidentiary hearing.* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (1990) .... When considering a challenge to its personal jurisdiction on the parties' filings, the court must resolve factual conflicts in favor of the party asserting jurisdiction for the purpose of determining whether he or she has made the requisite prima facie showing. [*Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989) ]; *Eastern Marketing Corp. v. Texas Meridian Prod. Co., Ltd.,* 798 F.Supp. 363, 364 (S.D.W.Va.1992)(Haden, C.J.). The Court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Bakker,* 886 F.2d at 676.

*Bashaw v. Belz Hotel Management Co., Inc.,* 872 F.Supp. 323, 324 (S.D.W.Va.1995)(quoting *Clark v. Milam,* 830 F.Supp. 316, 318–319 (S.D.W.Va.1993)(emphasis in original)).

### B. Analysis of Specific Jurisdiction

#### 1. Intentional Infliction of Emotional Distress

Although the parties focus scant attention on the agreement signed by Mrs. Miller, it has substantial relevance to the personal jurisdiction inquiry. In exchange for transporting her mortally injured husband back to the United States, SMS demanded the Millers first "acknowledge that the actions taken by SMS ... to assist Mr. Miller in his return to the United States [we]re purely for humanitarian reasons

and SMS ... d[id] not admit any liability for any injuries sustained by Mr. Miller ... at the scene of the accident." (Ex. 2, Pl.'s Resp. to Def.'s Mot. to Dismiss.)[4]

Just two months ago, the Supreme Court revisited the liberal, notice pleading standard to which a complaint is held under *Rule* 8(a)(2), *Federal Rules of Civil Procedure.* Writing for a unanimous court in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), Justice Thomas observed:

> Federal Rule of Civil Procedure 8(a)(2) ... provides that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court."

.    .    .    .    .

Other provisions of the Federal Rules of Civil Procedure are inextricably linked to Rule 8(a)'s simplified notice pleading standard. Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required," and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." Given the Federal Rules' simplified standard for pleading, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.... The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim.

*Id.* at 998–99 (citations omitted).

■ Guided by these liberal standards, one must determine what causes of action Plaintiff has pled. It is plain Mrs. Miller has asserted two negligence claims against SMS arising out of an alleged (1) unsafe workplace for her husband (Count Two), and (2) design defects inherent in the steel casting facility that caused his death (Count Three).

■ In contrast to these two well-pled claims, however, Count Four is enigmatic.

4. Mrs. Miller signed the agreement individually and on her husband's behalf. The Court notes the agreement requires Donna Miller and, assuming lawful agency status, her husband, to forbear from asserting SMS's transport of Mr. Miller to the United States amounted in any way to an admission of liability for the injuries he sustained in the accident. The validity of the agreement is an issue in this case. Indeed, the Complaint requests a determination by the Court the agreement is:

void *ab initio* since she had no power or authority to sign such a document and bind Charles Miller or his estate at the time it was signed. Furthermore, the release is void as being signed under duress and in an attempt to obtain costly transportation of her husband from [South] Korea to the United States when defendants were withholding such transportation pending execution of a release of all claims. (Compl. ¶ 24.)

Although Count Four appears aimed solely at the recovery of punitive damages, such damages are not recognized under the law to express a separate cause of action. *See Miller v. Carelink Health Plans, Inc.*, 82 F.Supp.2d 574, 579 n. 6 (S.D.W.Va.2000)(stating "Defendant claims the testimony creates a 'cause of action' for punitive damages; such damages are rather, of course, a form of relief. West Virginia law does not recognize an independent cause of action for punitive damages. *See Cook v. Heck's, Inc.*, 176 W.Va. 368, 376 n. 3, 342 S.E.2d 453, 461 n. 3 (1986)").

The question then arises: if Mrs. Miller did not, and in fact could not, plead a separate and independent claim for punitive damages, what claim is made in Count Four?

In Syllabus Point three of *Travis v. Alcon Laboratories, Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998), the Supreme Court of Appeals set forth the following elements for a claim of intentional infliction of emotional distress:

> [F]or a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Id.*

Although an element-by-element analysis is unnecessary under notice-pleading standards, it is illuminating here. Regarding the first element, Plaintiff alleges SMS' tender of, and insistence upon, the agreement "is of such an outrageous and unconscionable nature as to shock the reasonable person." (Compl.¶ 57.) Regarding the second element, Mrs. Miller alleges SMS acted both wilfully and wantonly. This appears to satisfy the requirement a defendant acted recklessly, with the substantial certainty that emotional distress would result.

Regarding the last two elements, it is certainly conceivable and reasonable that Mrs. Miller might have suffered emotional distress of sufficient magnitude to support the claim. One need only consider (1) her repeated requests for transport, (2) her husband's "horrific injuries" and near-death status (Compl.¶ 20), (3) the desperate nature of the situation, and (4) being required "[u]nder duress . . . [and] without the advice or aid of counsel" to execute a legal document potentially sacrificing important legal rights.

Also, in relation to the other Counts, Mrs. Miller alleges she has suffered "extreme mental anguish." Whether Mrs. Miller suffered the requisite emotional distress to support Count Four is a matter for dispositive motions or, perhaps, the fact finder. It appears clear, however, she has sufficiently alleged, or could with further amendment allege, a claim on her own behalf for the tort of outrage based on the circumstances surrounding the agreement.

### 2. The Jurisdictional Nexus and Pendent Personal Jurisdiction

The West Virginia long arm statute has been construed to extend to the limits of due process. Accordingly, the usual two step process for determining jurisdiction merges into one, namely whether the exercise of jurisdiction satisfies due process.

Even treating the now-merged inquiry as two separate steps, however, jurisdiction is proper.

Section 31–1–15 addresses the amenability to service of process of foreign corporations conducting affairs or transacting business in this state without having been first authorized by the Secretary of State. Such a corporation can be lawfully served, *inter alia,* (a) when it makes a contract to be performed, in whole or in part, by any party to the contract in this state, or (b) when it commits a tort, in whole or in part, in this state. The statute contains the additional proviso that any action or proceeding against such a corporation must arise from, or grow out of, such contract or tort.

▆▆ The present action satisfies both prongs of the long-arm statute. First, the agreement was to be performed in part in this state. The agreement required Mrs. Miller, individually, and in her representative capacity for her husband's estate, to forbear from treating the transport of her husband as an SMS admission of liability for the injuries he sustained in the accident. The forbearance requirement, of course, is of a continuing nature. Mrs. Miller was not simply required to forbear in South Korea, but also in this State once she returned home. Her present attempt in the complaint seeking a declaration the agreement is void plainly demonstrates at least part of this action arises from and grows out of the agreement.

Second, liberally construed, the complaint alleges a tort claim for intentional infliction of emotional distress arising from the circumstances surrounding the execution and performance of the contract. While the putative outrageous conduct occurred during Plaintiff's and her decedent's visit to South Korea, it is reasonable to posit that part of the emotional distress, and thus part of the tort, was suffered here after Mrs. Miller's return.

▆▆ Three factors require analysis under the second, due process component of the jurisdictional inquiry. The first two factors examine (1) the extent to which SMS "purposefully avail[ed]" itself of the privilege of conducting activities in West Virginia, thus invoking the benefits and protections of its laws, and (2) whether Plaintiff's claims arise out of those West Virginia related activities. As the Court of Appeals recently noted, purposeful availment is suggested " 'where the defendant "deliberately" has engaged in significant activities within a State, *or* has created "continuing obligations" between himself and residents of the forum.' " *Christian Science Bd. of Directors of First Church of Christ, Scientist v. Nolan,* 259 F.3d 209, 217 (4th Cir.2001)(quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985))(emphasis added).

▆▆ The "continuing obligation" prong may be satisfied from the agreement requiring Mrs. Miller, both individually and in her representative capacity, to forbear perpetually from asserting that SMS implicitly admitted liability by agreeing to transport her injured husband to the United States. At the time the agreement was executed, it appears SMS was aware that both Mrs. Miller and her husband resided in West Virginia. SMS was also aware the agreement would continue to protect it once Mrs. Miller returned to West Virginia. Had Mrs. Miller breached the agreement by publicly asserting an SMS admission of liability or otherwise, SMS could have sought enforcement of the bargain in West Virginia, the Millers' residence. Further, as discussed *supra,* at least one of Plaintiff's claims here arises out of the agreement.

■ The third and final consideration for specific jurisdiction under the due process clause is whether the exercise of judicial power over SMS would be constitutionally reasonable. *Nolan* guides the inquiry:

In determining whether jurisdiction is constitutionally reasonable, we may evaluate "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." More generally, our reasonableness analysis is designed to ensure that jurisdictional rules are not exploited "in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.'"

*Nolan,* 259 F.3d at 217.

The potential burdens on SMS do not appear onerous. First, SMS's home state is contiguous to this forum. SMS also appears financially able to finance the litigation here. Second, West Virginia has a strong interest in adjudicating the dispute. *Compare Lee v. Walworth Valve Co.,* 482 F.2d 297, 299–300 (4th Cir.1973)("The interest of South Carolina is substantial ... for it has a paternal interest in the recovery by one of its citizens of appropriate compensation, if there is a substantive cause of action. To the extent that Mrs. Lee, or she and her dependents, deprived

of the support of her husband, might become a public charge, or charges, South Carolina has an immediate interest in her vindication of any private right of action she may have for the wrongful death of her husband.").[5] Third, Mrs. Miller's interest in obtaining convenient and effective relief is directly implicated. There are a host of difficulties, financial and otherwise, encountered by a private citizen in prosecuting extraterritorial litigation, especially when the accident occurred in a foreign country.[6]

Examination of these factors and the remaining considerations demonstrate the constitutional reasonableness of exercising jurisdiction over SMS. Doing so ensures jurisdictional rules are not exploited "in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent.'" *Id.*

■ The Court concludes it has personal jurisdiction over SMS concerning those claims and defenses arising out of the release agreement. The question remains, however, whether the Court also may require SMS to defend the two negligence claims in this forum. The Court exercises its discretion to reach those remaining claims under the doctrine of pendent personal jurisdiction.

In *ESAB Group Inc. v. Centricut, Inc.,* 126 F.3d 617 (4th Cir.1997), Judge Niemeyer, writing for the panel, "joined the other circuits that have" adopted the doc-

---

5. The Court notes Mrs. Miller applied for, and has been receiving, dependent benefits from the West Virginia Workers' Compensation Division. According to Plaintiff's counsel, there is also a $2 million medical bill to be paid for Mr. Miller. West Virginia thus has a possible subrogation interest in any recovery in this case.

6. The Court recognizes Miller also filed action against SMS in Pennsylvania. Undoubtedly Plaintiff and her counsel would prefer to pursue the litigation here, if due process allows them to choose this forum.

trine of pendent personal jurisdiction.[7] The exercise of such jurisdiction is discretionary and is dependent upon all of the claims sharing a common nucleus of operative fact. The Court finds a common nucleus present here. All of the claims arise from the circumstances surrounding Mr. Miller's accident at the Dongkuk facility. Accordingly, it is proper to exercise pendent personal jurisdiction over the two negligence claims. SMS' request for dismissal for lack of personal jurisdiction is **DENIED.**

## C. Analysis of General Jurisdiction

■ In the alternative, the Court concludes Mrs. Miller has sufficiently alleged a *prima facie* case for general jurisdiction. To find general jurisdiction, SMS' contacts with this state would have to be "continuous and systematic" in nature. As noted *supra,* a plaintiff's burden on the jurisdictional issue at this stage of the jurisdictional inquiry is not a heavy one. Further, the Court construes all relevant allegations in the light most favorable to Mrs. Miller, assumes her credibility, and draws the most favorable inferences for the existence of jurisdiction. Mrs. Miller asserts, *inter alia,* the following:

1. In the roughly six years preceding the accident, SMS earned revenue from at least two West Virginia entities in excess of $55 million;

2. SMS' transactions with West Virginia entities include:

   a. A $53 million dollar rebuild of a caster at Weirton Steel (Weirton) in Weirton, West Virginia, concluding in 1991;

   b. A $1 million dollar project with Weirton in 1998;

   c. Invoicing to Weirton for work performed in the state totaling in excess of $100,000.00 since 1990;

   d. Over 71 visits to Weirton in just the last five years;

   e. The 1990 caster rebuild, in addition to the multi-million dollar, original installation in 1964, involved a year or more of work in West Virginia.

Assuming the truth of these allegations, some of which are vigorously disputed by SMS, and drawing all favorable inferences for Mrs. Miller, the contacts are sufficiently regular and continuous to support the exercise of general jurisdiction.[8]

7. *ESAB* recognized pendent personal jurisdiction over state law claims when a district court has first obtained personal jurisdiction over a defendant by reason of a federal claim authorizing nationwide service of process. A careful reading of the underlying analysis in *ESAB,* however, demonstrates it would also apply to reach all state law claims in an action where (1) jurisdiction is approved for at least one substantial state claim; and (2) all of the claims arise from a common nucleus of operative fact. *See ESAB,* 126 F.3d at 628; *see also* 4A Charles A. Wright *et al., Federal Practice & Procedure* § 1069.7 (2002); Linda Sandstrom Simard, *Exploring the Limits of Specific Personal Jurisdiction,* 62 Ohio St. L.J. 1619, 1619 (2001)("The article concludes that in most instances there will be no constitutional or statutory impediment to the federal court's exercise of pendent personal jurisdic-

tion regarding jurisdictionally insufficient counts that arise out of the same constitutional case as a jurisdictionally sufficient anchor count, whether the basis for jurisdiction over the anchor count is a nationwide service of process statute or a state long-arm statute.").

8. In making the determination, the Court is guided by Judge Niemeyer's careful analysis in *ESAB. ESAB* discusses several cases in which the Court of Appeals has either approved or disapproved the exercise of general jurisdiction. This case bears a marked resemblance to one of the cases analyzed in *ESAB, Lee v. Walworth Valve Co.,* 482 F.2d 297 (4th Cir.1973).

In *Lee,* both plaintiff and her decedent were South Carolina residents, the forum state. The decedent was killed when a valve malfunctioned on a ship while at sea. Walworth

### III. CONCLUSION

Based on the foregoing, the Court **FINDS** and **CONCLUDES** Plaintiff has made a prima facie showing to support the exercise of personal jurisdiction. Accordingly, the Court **DENIES** the motion for dismissal.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post a copy on the Court's website at www.wvsd.uscourts.gov.

manufactured the valve. Walworth, however, had very minimal contacts with South Carolina. It maintained no place of business, owned no property, and had neither any bank accounts nor any resident salesmen or other agents in the state. Several salesmen, however, spent eighty days soliciting business there in 1969, eighty-seven days in 1970, and seventy-five days in 1971. Aggregate sales of Walworth and its two wholly owned subsidiaries to South Carolina customers in 1969 were $245,713.56; in 1970, they were $399,485.15, and in 1971, they were $179,607.30. These figures were deemed significant despite the recognition "[t]he volume of business resulting represented but a small percentage of Walworth's total sales[.]" *Id.* at 299. The Court of Appeals also found significant the following fact:

> The difficulty in the case arises out of the fact that the cause of action did not grow out of any of Walworth's activity in South Carolina. The cause of action did not even arise in that State, for the injury occurred on the high seas. *On the other hand, it is relevant to note that the cause of action did not arise in any other state whose courts might provide a more likely forum. This means that there probably are only two states in the United States with any interest in the controversy, the state of Walworth's domicile, and South Carolina, the residence of the decedent and of his widow and executrix.*

*Id.* at 299 (emphasis added).