866 So.2d 519 (2003)
Ex parte DILL, DILL, CARR, STONBRAKER & HUTCHINGS, P.C., and Fay Matsukage.
(In re Allen Austin et al. v. Dill, Dill, Carr, Stonbraker & Hutchings, P.C., et al. Mary Champion et al. v. Dill, Dill, Carr, Stonbraker & Hutchings, P.C., et al.).
1011586.
Supreme Court of Alabama.
February 21, 2003.
Rehearing Denied May 30, 2003.
*521 Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., and Robert J. Campbell of London & Yancey, L.L.C., Birmingham, for petitioners.
E. Britton Monroe of Lloyd, Gray & Whitehead, P.C., Birmingham; Andrew P. Campbell and Caroline Smith Gidiere of Campbell, Waller & Loper, L.L.C., Birmingham; and Frank Corley Ellis, Jr., of Wallace, Ellis, Fowler & Head, Columbiana, for respondents.
WOODALL, Justice.
Dill, Dill, Carr, Stonbraker & Hutchings, P.C., and Fay Matsukage petition this Court for a writ of mandamus directing the Shelby Circuit Court to vacate its order denying their motion to dismiss, for lack of in personam jurisdiction, the plaintiffs' claims against them in two actions pending in that court. We grant the petition.

*522 I. Facts

This dispute arose out of failed investment plans developed by some, or all, of the following: (1) Steven S. Nichols, (2) Charles E. Dickerson, (3) Lawrence B. Lavin, (4) Andrew P. Leventis, Jr., (5) Myron Livingston, (6) Hugh MaCaulay, (7) Frank M. Miller, (8) James C. Norton, (9) Joseph L. Pertz, Jr., (10) Philip A. Sharpton, and (11) Charlie M. Thackston (hereinafter referred to collectively as the "Developers"). Of those 11 Developers, only oneJames Nortonwas an Alabama resident. The investment plans envisioned raising funds through the sale of securities for reinvestment in companies owned by Richard Homa and Michael Gause. Through those companies, which included C4T, Inc. ("C4T"), and Sunset Financial Services, L.L.C. ("Sunset"), Homa and Gause operated a number of stores, known as "Cash 4 Titles."
According to the Developers, "Messrs Homa and Gause raised money from investors (such as Plaintiffs in this case) that was to be loaned to C4T, which in turn would finance the Cash 4 Titles' stores to make car loans to the general public." Respondents' Brief in Opposition to Petitioners' Petition for Writ of Mandamus (hereinafter "Respondents' Brief"), at 4. "Messrs Homa and Gause agreed to pay investors between 1% and 4% per month on funds loaned to C4T and remit the interest payments to investors on a monthly basis." Id.

A. Plan OneBellwether
In February 1998, five individuals, including Nichols, Sharpton, Pertz, and Norton, implemented the first of two investment plans. They did so by forming Bellwether Holdings, L.L.C. ("Bellwether"), a Colorado limited-liability company, through which theyas "managing marketers"proposed to issue 270-day promissory notes to potential investors throughout the United States. As they explain it, "The money raised from the sale of the promissory notes would be pooled and transferred to C4T for use in the Cash 4 Title stores. C4T would then remit interest payments monthly to Bellwether, which would then be remitted to Bellwether's investors." Respondent's Brief, at 5.
Dilla Colorado law firm located in Denverwas, according to the Developers, retained by Bellwether to "review[] the Bellwether securities offering to ensure it complied with the State (including Alabama) and Federal securities laws where the promissory notes were being sold, [and to determine] whether any State or Federal securities filings needed to be made and whether the promissory notes were exempt securities." Affidavit of Steven Nichols. The Developers allege that this project was undertaken specifically by Matsukage, a lawyer and shareholder in Dill. According to the Developers, Matsukage represented that the offering documents and the promissory notes complied with the securities laws of the United States and of those states in which Bellwether proposed to sell the notes.[1]
From March 1998 to June 10, 1999, Bellwether sold the promissory notes and invested the proceeds in C4T. Seven individuals residing in Alabama, including Mary Champion and Allen Austin, invested approximately $527,292 in the Bellwether offering.

B. Plan TwoSouthwestern
In June 1998, the Developers created a second entity through which to raise money *523 for investment in the car-title-loan business. More specifically, the Developers formed Southwestern Holdings, L.L.C. ("Southwestern"), to loan money to Sunset, a foreign entity with its principal place of business in Georgia. Through Southwestern, they proposed to issue seven-year bonds to investors throughout the United States.
Southwestern was organized under the laws of Nevada. Southwestern's "Private Placement Memorandum" describes Nichols as the "Managing Director." In that document, the other Developers, including Norton, were described as "Marketing Managers."
Dill was retained, among other things, to draft offering documents for Southwestern's seven-year bonds and to ensure that the bond offering complied with the securities laws of the United States and of the states in which the bonds were to be sold. It is undisputed that Matsukage was the Dill attorney responsible for providing those services.
In that connection, she prepared and mailed to the securities commissions of various statesincluding Alabamaan instrument, styled "Form-D Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption" (the "Form-D notice"). The eight-page form primarily contains information regarding (1) the date of Southwestern's organization or incorporation; (2) Steven Nichols's name and his address as Southwestern's "promoter" and "general and/or managing partner"; (3) the "minimum investment [to] be accepted from any individual"; and (4) the "aggregate offering price" of the bonds to be offered. Accompanying the Form-D notice was a "Form U-2 Uniform Consent to Service of Process" (the "consent form"), by which Southwestern appointed the secretary of state as its attorney to receive process. Also on that form was the following:
"It is requested that a copy of any notice, process or pleading served hereunder be mailed to:
"Fay M. Matsukage, Esq.
Dill, Dill, Carr, Stonbraker & Hutchings, P.C.
455 Sherman Street, Suite 300
Denver, Colorado 80203"
In their briefs to this Court, the parties referas we do hereinafter collectively to the mailing of the Form-D notice and the consent form to the Alabama Securities Commission as the "blue-sky filing."[2]
From March 1999 through June 10, 1999, Southwestern sold bonds and loaned the proceeds from the sale to Sunset. Nineteen Alabama residents invested $2,539,000 in the Southwestern offering.

C. Procedural History
Southwestern and Bellwether investors received their interest payments until October 1, 1999. By that time, an investigation of Homa and Gause by the United States Securities and Exchange Commission ("the SEC") had revealed that Homa and Gause were involved in what the Developers describe as a "Ponzi" scheme.[3] As the Developers describe it:

*524 "Unbeknownst by any of the Plaintiffs in this lawsuit, most, if not all, of the investor funds were not used by C4T [or Sunset] for the car title loan business. Instead, C4T [and Sunset] transferred the funds to accounts at the Bank of Bermuda in the Cayman Islands controlled by Messrs Homa and Gause and used the funds, in classic Ponzi scheme fashion, to pay interest to investors and pay personal expenses for Messrs Homa and Gause to support their lavish lifestyle. It is estimated Messrs Homa and Gause collected in excess of $200 million from over 2,200 investors.
"In October 1999, the [SEC] uncovered the scheme and arrested Messrs Homa and Gause. Messrs Homa and Gause [pleaded] guilty to criminal violations of federal securities laws. Mr. Gause is [currently] incarcerated, serving a 12 year sentence. Mr. Homa is awaiting federal sentencing."
Respondents' Brief, at 4.
The SEC eventually included in its investigation some of the Developers, including Alabama resident James Norton. Indeed, Norton retained Dill in October 1999 to represent him in the SEC investigation. Norton's representation was undertaken by attorney John A. Hutchings.
On April 27, 2001, Bellwether, Southwestern, 8 of the Developers, and 19 other individuals or entities residing in 7 states, who had invested in Bellwether or Southwestern, commenced case CV-01-430 in the Shelby Circuit Court against, among others not material to this proceeding, Dill, Hutchings, and Matsukage. On May 11, 2001, a complaint was filed in case CV-01-430 by Mary Champion and others, which amended or "superseded" the original complaint. The amended complaint contained the claims of approximately 135 plaintiffs, in addition to the claims of the plaintiffs in the original complaint (that case is hereinafter referred to as "Champion"). In all, Champion involved the claims of plaintiffs from 17 states in which the Bellwether and Southwestern securities were sold. The claims against Dill and Matsukage were set forth in 22 counts. Of those counts, 17 alleged violations of the securities laws of 17 states in which Bellwether and Southwestern securities were sold.[4] The remaining counts alleged (1) breach of contract, (2) common-law fraud, (3) breach of fiduciary duty, (4) professional malpractice, and (5) negligent supervision.
On September 12, 2001, Allen Austin, an Alabama resident, and a second group of plaintiffs, who had invested in Bellwether, Southwestern, or both, commenced case CV-01-971 in the Shelby Circuit Court (that case is hereinafter referred to as "Austin"). The complaint in Austin contained claims against Dill and Matsukage, alleging violations of the securities laws of 11 states, including 2 states not alleged in Champion.[5] Like the complaint in Champion, the Austin complaint also contained counts against Dill and Matsukage alleging (1) breach of contract, (2) common-law fraud, (3) breach of fiduciary duty, (4) professional malpractice, and (5) improper supervision. Neither Austin nor Champion *525 alleged violations of the securities laws of the United States.[6]
On March 1, 2002, Dill and Matsukage filed a motion to dismiss, challenging the exercise of personal jurisdiction over them in both cases. The trial court denied the motion. Dill and Matsukage seek a writ of mandamus directing the trial court to dismiss the claims against them. Dill and Matsukage contend that the exercise of in personam jurisdiction over them is unauthorized by Ala. R. Civ. P. 4.2(a), Alabama's "long-arm" rule, and offends the due-process guarantees of the United States Constitution. We agree with these contentions.

II. Preliminary Matters
We reiterate that a petition for a writ of mandamus is the proper device by which to challenge the denial of a motion to dismiss for lack of in personam jurisdiction. See Ex parte McInnis, 820 So.2d 795 (Ala.2001); Ex parte Paul Maclean Land Servs., Inc., 613 So.2d 1284, 1286 (Ala.1993). "`An appellate court considers de novo a trial court's judgment on a party's motion to dismiss for lack of personal jurisdiction.'" Ex parte Lagrone, 839 So.2d 620, 623 (Ala.2002) (quoting Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala.2002)). Moreover, "[t]he plaintiff bears the burden of proving the court's personal jurisdiction over the defendant." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir.2002). See also Beasley v. Schuessler, 519 So.2d 551, 553 (Ala.Civ.App.1987); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1351 (2d ed.1990).

III. Discussion
"A physical presence in Alabama is not a prerequisite to personal jurisdiction over a nonresident." Sieber v. Campbell, 810 So.2d 641, 644 (Ala.2001). What is required, however, is that the defendant have such contacts with Alabama that it "`should reasonably anticipate being haled into court [here].'" Dillon Equities v. Palmer & Cay, Inc., 501 So.2d 459, 462 (Ala.1986) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).
Depending on the quality and quantity of the contacts, jurisdiction may be either general or specific. Leventhal v. Harrelson, 723 So.2d 566, 569 (Ala.1998). "General jurisdiction applies where a defendant's activities in the forum state are `substantial' or `continuous and systematic,' regardless of whether those activities gave rise to the lawsuit.... A court has specific jurisdiction when a defendant has had few contacts with the forum state, but those contacts gave rise to the lawsuit." Id.
But regardless of whether jurisdiction is alleged to be general or specific, the nexus between the defendant and the forum state must arise out of "`an action of the defendant [that was] purposefully directed toward the forum State.'" Elliott, supra, 830 So.2d at 731 (quoting Asahi Metal Indus. Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). "This purposeful-availment *526 requirement assures that a defendant will not be haled into a jurisdiction as a result of `"the unilateral activity of another person or a third person."'" Elliott, 830 So.2d at 731 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).
Rule 4.2(a)(2), Ala. R. Civ. P., sets forth specific "requirements for [the exercise of] personal jurisdiction over a nonresident defendant." Murray v. Alfab, Inc., 601 So.2d 878, 883 (Ala.1992). Rule 4.2(a)(2) provides, in pertinent part:
"(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
"(A) transacting any business in this state;
"(B) contracting to supply services or goods in this state;
"(C) causing tortious injury or damage by an act or omission in this state including but not limited to actions arising out of the ownership, operation or use of a motor vehicle, aircraft, boat or watercraft in this state;
"(D) causing tortious injury or damage in this state by an act or omission outside this state if the person regularly does or solicits business, or engages in any other persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this state; [or]
"....
"(I) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States."
In denying the motion to dismiss, the trial court did not indicate whether it regarded its jurisdiction to be general or specific. The plaintiffs in Austin and Champion (those plaintiffs are hereinafter referred to collectively as "the respondents") contend that Dill's contacts with Alabama constitute a sufficient basis for both general and specific jurisdiction. In particular, they insist that jurisdiction is proper, based on Rule 4.2(a)(2)(A)-(D) and (I). We first consider the respondents' contention that Dill is subject to general jurisdiction.

A. General Jurisdiction
In this connection, the respondents insist that Dill "has had `continuous and systematic' contacts with the State of Alabama since 1994," which contacts, they argue, are sufficient "to sustain general personal jurisdiction." Respondents' Brief, at 47. Specifically, they allege:
"[1.] From 1994 through 1999, [Dill] represented a foreign national residing in Alabama; sent correspondence, facsimiles and made telephone calls into the State of Alabama in connection with the representation; and made a trip to the State of Alabama as part of the representation.
"[2.] [Dill] received compensation for these services from the Alabama resident from the State of Alabama.
"[3.] [John] Hutchings has also traveled to Alabama on two (2) occasions, one of those occasions between 1996 and *527 1998, as part of his legal representation of other clients.
"[4.] [Dill] represented Jim Norton, an Alabama resident and partial owner of Bellwether, with respect to the Bellwether offering.
"[5.] Mr. Norton paid to [Dill] funds derived from the State of Alabama for [Dill's] legal services rendered with respect to the Bellwether offering.
"[6.] [Dill] represented Jim Norton, an Alabama resident and a partial owner of Southwestern, with respect to the Southwestern offering.
"[7.] Mr. Norton paid to [Dill] funds derived from the State of Alabama for [Dill's] legal services rendered with respect to [the] Southwestern offering.
"[8.] [Dill] and [Fay] Matsukage made a Blue Sky filing with the Alabama Securities Commission for the Southwestern offering.
"[9.] [Dill] and Ms. Matsukage are registered with the Alabama Securities Commission as the agents for process of service of Southwestern.
"[10.] Mr. Hutchings has recently been retained to represent the same group of corporations controlled by the foreign national he was representing from 1994-1999, who is still a resident of the State of Alabama.
"[11.] [Dill] is [currently] receiving compensation from the Alabama resident for this representation.
"[12.] Mr. Hutchings and [Dill] represented Mr. Norton, an Alabama resident, as part of the SEC's investigation into Bellwether and Southwestern.
"[13.] Mr. Hutchings had numerous conversations with Mr. Norton regarding his representation of Mr. Norton while Mr. Norton was in the State of Alabama.
"[14.] [Dill] and Mr. Hutchings sent invoices into the State of Alabama by mail to Mr. Norton for payment of legal services rendered to Mr. Norton.
"[15.] [Dill] received income derived from the State of Alabama from Mr. Norton for this representation.
"[16.] [Dill] continued to send invoices to Mr. Norton for alleged balances owed on Mr. Hutchings' representation of Mr. Norton with respect to the SEC investigation until these actions were filed."
Id. at 47-48 (citations to exhibits omitted). To facilitate discussion, we will group these allegations into five categories: (1) the representation of "other clients," (2) the representation of Bellwether and Southwestern, (3) the compensation, (4) the SEC investigation, and (5) the blue-sky filing.

1. Representation of Other Clients
Paragraphs 1 and 3 allege that, between 1994 and 1999, Dill represented certain clients in Alabama, in addition to those involved in this dispute. Evidence regarding that representation comes exclusively from the affidavit of John Hutchings. That affidavit states, in pertinent part:
"11. Neither [Dill] nor any of its shareholders regularly does business in the State of Alabama. After a diligent personal review, the affiant is informed and believes and upon such information and belief states, that the only business conducted in the State of Alabama by any shareholder of [Dill] occurred during approximately the 1994 through 1999 time period when the affiant represented a group of related corporations controlled by a foreign national (who was residing in Alabama during that period) with respect to certain general business and international law issues. That representation did not involve or pertain to *528 Alabama law. The affiant's representation of that individual was primarily performed through the use of the telephone, facsimile and U.S. mail systems. In fact, the affiant only made one trip to Alabama as part of that representationa trip which occurred in or around 1995. Moreover, the affiant, based upon his information and belief, further states that he has been in the State of Alabama only two other times for clients other than the one described above. These visits each lasted less than one day with the first visit occurring in the mid 1980's and the second visit occurring sometime between 1996 and 1998. Neither the affiant's representation of the foreign national, nor the two other trips he made to the State of Alabama, relate in any way to the allegations set forth in the Plaintiff's Complaint in the above-styled action.
"....
"13. After a diligent personal review, the affiant is informed and believes, and upon such information and belief states, that neither [Dill] nor any of its shareholders have ever represented any individual residing in (or entity domiciled or organized under the laws of) the State of Alabama, other than as described in Paragraph 11 above. That representation, which did not relate to Alabama law and which has no relation to the facts set forth in the plaintiffs' Complaint in the above-styled action, began sometime in approximately 1994 and ended sometime in approximately 1999. Recently, [Dill] has been requested to provide limited representation to one of the foreign corporations of the group of related corporations referred to in Paragraph 11 above. [Dill] has agreed to provide such representation.
"....
"15. Neither [Dill] nor any of its shareholders derive or has derived any substantial revenue from goods used or consumed or services rendered in the State of Alabama, other than the revenues earned from the representation described in Paragraph 11, above. Notably, the revenue earned from that single representation was not substantial in relation to the overall revenues of [Dill] during that same time period."
(Emphasis added.)
The affidavit is more instructive for what it omits than for what it reveals. Although it concedes representation of clients having some connection with Alabama over a period of years, both before and after the events giving rise to this action, it contains no specific information as to the nature of the contacts associated with that representation. For example, the clients not only are anonymous, but are not sufficiently described to determine their state, or states, of residency. Apparently, the corporations Dill represented were not organized under the laws of Alabama. Paragraph 13 of the affidavit specifically states that one of the clients was "one of the foreign corporations of the group of related corporations [controlled by a foreign national who was residing in Alabama during that period]." Both paragraphs state that the representation did not involve Alabama law.
Moreover, the affidavit is ambiguous as to which of those persons or entities was actually Hutchings's client. Hutchings once says that "he represented a group of related corporations controlled by a foreign national." Elsewhere, he says that he represented the "foreign national." The distinction is not one of mere semantics for purposes of a minimum-contacts analysis. If Dill's clients were, in fact, foreign corporations, the one trip Hutchings made to Alabama may have been the only contact *529 with this state relatedeven tangentiallyto his representation. The distinction is important for purposes of the foreseeability of defending against a suit in Alabama. However, the materials filed in this case do not provide an evidentiary basis for resolution of this issue or similar contact issues.
Paragraphs 10 and 11 of the respondents' allegations allege that Hutchings "has recently been retained to represent [that] same group of corporations controlled by the foreign national," and that "[Dill] is [currently] receiving compensation from the Alabama resident for this representation." These allegations are irrelevant to an assessment of the nexus of Dill's contacts with Alabama. Elliott v. Van Kleef, 830 So.2d 726, 731 (Ala. 2002) ("`[o]nly contacts occurring prior to the event causing the litigation may be considered'" (quoting Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co., 907 F.2d 911, 913 (9th Cir.1990))).
Hutchings also states that he made a total of three trips to Alabama, only one of which related to the "foreign national." The other trips were taken in connection with the representation of other clients, about whom we are told absolutely nothing. One of the trips was in the 1980's, and the other was in approximately 1997. Thus, evidence of contacts arising out of those attorney-client relationships is even less illuminating than that regarding Hutchings's representation of the "foreign national." There is no evidence as to where the contracts were negotiated, originated, or were consummated, or whether third parties were involved in the formation of those attorney-client relationships. See United Elec., Radio & Mach. Workers of America v. 163 Pleasant Street Corp., 960 F.2d 1080, 1089 (1st Cir.1992) ("in a contract case, the defendant's forum-based activities must be `instrumental in the formation of the contract'"). There is no evidence of the nature, or the value, of Dill's services. There is no evidence as to where the litigationif anyoccurred.
"[C]ase law overflows on the point that providing out-of-state legal representation is not enough to subject an out-of-state lawyer or law firm to the personal jurisdiction of the state in which a client resides." Cape v. von Maur, 932 F.Supp. 124, 128 (D.Md.1996) (citing Sher v. Johnson, 911 F.2d 1357, 1363 (9th Cir. 1990); Austad Co. v. Pennie & Edmonds, 823 F.2d 223 (8th Cir.1987); Kowalski v. Doherty, Wallace, Pillsbury, & Murphy, 787 F.2d 7 (1st Cir.1986); and Mayes v. Leipziger, 674 F.2d 178 (2d Cir.1982)). "The mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state; more is required." Sawtelle v. Farrell, 70 F.3d 1381, 1392 (1st Cir.1995) (emphasis added). See also Porter v. Berall, 142 F.Supp.2d 1145 (W.D.Mo.2001), aff'd, 293 F.3d 1073 (8th Cir.2002); Elliott v. Van Kleef, supra. In the context of the attorney-client relationship, a lawyer's out-of-state activities, undertaken on behalf on an in-state client however substantialare immaterial to a minimum-contacts analysis.
It is undisputed that the "other" attorney-client relationships ambiguously described in the Hutchings affidavit are unrelated to this litigation. Those amorphous contacts cannot, as the respondents insist, form the basis for general jurisdiction. The contacts are not "regular" or "systematic." As described, they are, at most, random and sporadic. Thus, we are compelled to discount altogether the contacts with other clients as a basis for jurisdiction.

*530 2. Representation of Bellwether and Southwestern

In paragraphs 4 and 6, the respondents contend that Dill and Matsukage "represented Jim Norton, an Alabama resident," in connection with the Bellwether promissory-note offering and the Southwestern bond offering. This contention, however, mischaracterizes their representation. The respondents present no evidence to indicate that they ever purported to represent Norton. On the contrary, the evidence, to the extent it conflicts and is construed in favor of the respondents, demonstrates that they represented Bellwether, and it demonstrates conclusively that they represented Southwestern.[7]
Bellwether and Southwestern were limited-liability companies, of which Norton was merely a fractional owner. His share in Bellwetherat least as to responsibility for Dill's feewas one-sixth, and in Southwestern, one-eleventh. We are directed to no evidence indicating that Norton ever contracted with Dill. Instead, it was Nichols who contracted with Dill on behalf of both companies. Nichols's official designation was "Managing Director." The other Developers, including Norton, were officially designated "Marketing Managers."

3. Compensation for Representation
In paragraphs 5 and 7 of their allegations, the respondents argue that jurisdiction may be premised on the fact that Dill received compensation for representing Norton. As we explained in the preceding part of this opinion, Dill did not represent Norton. Also, to reiterate, the rule is well established that "providing out-of-state legal representation is not enough to subject an out-of-state lawyer or law firm to the personal jurisdiction of the state in which a client resides." Cape v. von Maur, 932 F.Supp. at 128. That rule would have little meaning if the firm could not merely invoice for its services without losing the benefit of the rule. For these reasons, this argument does not aid the respondents.

4. SEC Representation
In paragraphs 12-16, the respondents argue that Dill is subject to jurisdiction in Alabama because Hutchings represented Norton in the SEC investigation of Norton's involvement in Bellwether and Southwestern. This argument is based on Norton's affidavit, which states, in part:
"2. In October 1999, I retained Jack Hutchings (`Mr. Hutchings') ... to represent me in connection with the SEC's investigation into Bellwether [and] Southwestern.... I paid Mr. Hutchings $2,000.00 by check which was mailed from the State of Alabama to Mr. Hutchings for his representation. I received the cancelled check indicating Mr. Hutchings negotiated the check and I have no reason to believe [Dill] did not receive the money.
"3. During Mr. Hutchings' representation of me, I had numerous telephone conversations with Mr. Hutchings regarding the SEC's investigation while I was in the State of Alabama at my residence and on my telephone. Mr. Hutchings provided to me legal representation and advice during those conversations for addressing various SEC requests.

*531 "4. I would receive correspondence at my residence in the State of Alabama from Mr. Hutchings and would receive legal bills for services he allegedly rendered by mail at my home in the State of Alabama. I continued to receive periodic invoices from [Dill] by mail into the State of Alabama at my home address for alleged past due amounts owed for Mr. Hutchings' services as late as six (6) months ago. The bills coincidentally ceased coming to my residence in Alabama when I filed suit against Ms. Matsukage and [Dill]."
This argument fails for the same reasons expressed in Parts III.A.1. and A.3. of this opinion. It is undisputed that all the legal work performed for Norton was performed in Colorado and that the representation occurred before the SEC, that is, outside Alabama. In other words, Dill did not purport to provide Norton in-state representation. As we have stated previously in this opinion, a lawyer's out-of-state activities, undertaken on behalf on an in-state clienthowever substantialare immaterial to a minimum-contacts analysis.

5. Blue-Sky Filing
The respondents contend that the blue-sky filing gives rise to both general and specific jurisdiction. See paragraphs 8-9 of the respondents' allegations. Both the general-jurisdiction and specific-jurisdiction aspects of the blue-sky filing are discussed in Part III.B. of this opinion.

B. Specific Jurisdiction the Blue-Sky Filing
The respondents allege that Dill "prepared and performed an erroneous securities filing in the State of Alabama," and they contend that jurisdiction arises, both generally and specifically, out of this filing. Respondents' Brief, at 59. Both species of jurisdiction are authorized by Rule 4.2(a)(2)(I), the "catch-all provision" of Alabama's long-arm rule. See Jerome Hoffman & Sandra Guin, Alabama Civil Procedure § 2.48 (1990). Subsection (I) "extends the jurisdiction of this state's courts to the permissible limits of due process." Martin v. Robbins, 628 So.2d 614, 617 (Ala.1993). We first consider whether the one-time filing of a Form-D notice with the Alabama Securities Commission in connection with the Southwestern bond offeringthe sole contact material to our analysisforms a basis for the exercise of specific jurisdiction. If it does not, then, a fortiori, it does not give rise to general jurisdiction.
The respondents argue that Alabama has specific jurisdiction over Dill and Matsukage under the "effects test" set forth in Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and adopted by this Court. See Keelean v. Central Bank of the South, 544 So.2d 153, 157 (Ala.1989), overruled on other grounds, Professional Ins. Corp. v. Sutherland, 700 So.2d 347 (Ala.1997); Alabama Waterproofing Co. v. Hanby, 431 So.2d 141 (1983). According to Nichols's affidavit, the blue-sky filings "indicated [that] the bonds were exempt securities, which [was not the case, because] the bonds [were] not exempt securities and required additional and different filings." (Emphasis added.) Elsewhere, the respondents state that Dill and Matsukage "prepared and performed an erroneous securities filing in the State of Alabama." Respondents' Brief, at 59 (emphasis added). The respondents state: "[H]ad [Dill and Matsukage] gone through the proper registration process, the bonds would not have been allowed to be sold in Alabama since they could not have met the registration requirements." Id. at 39.
When specific jurisdiction is the basis for adjudication of claims against an out-of-state defendant, due process requires "a clear, firm nexus between the *532 acts of the defendant and the consequences complained of in order to establish the necessary contacts." Duke v. Young, 496 So.2d 37, 39 (Ala.1986) (applying the effects test). Discussing Calder, Duke explained:
"There the plaintiff was a resident of California. The defendants were residents of Florida. The defendants were employed as a writer and as an editor for National Enquirer, Inc., a Florida corporation having its principal place of business in Florida. The defendants were alleged to have authored and edited an article injurious to plaintiff, that article having been disseminated in, among other places, California. The Court did not find it necessary to look for physical contacts between the defendants and the forum state. It was the nature of the defendant's activities rather than the place of their occurrence that the Court considered: `[P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California.... [T]hey knew [the article] would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives....' [Calder v. Jones], 465 U.S. [783] at 789-90, 104 S.Ct. at 1487, 79 L.Ed.2d at 812 [(1984)].
"... [T]he Supreme Court concluded, `[P]etitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis.' Id., 465 U.S. at 790, 104 S.Ct. at 1487, 79 L.Ed.2d at 813."
496 So.2d at 39 (emphasis added).
We disagree with the respondents' contention that the evidence here satisfies the effects test. That test is particularly relevant to the "purposeful-availment requirement" of due process. United States v. Swiss American Bank, Ltd., 274 F.3d 610, 624 (1st Cir.2001). It presupposes a foreseeable injury to an identified, or identifiable, plaintiff. Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1088 (9th Cir.2000) ("The presence of individualized targeting is what separates these cases from others in which we have found the effects test unsatisfied.").
Here, the alleged "negligence" is considerably less "targeted" than was the wrongdoing in Calder. There, "[t]he allegedly libelous story concerned the California activities of a California resident. It impugned the professionalism of an entertainer whose television career was centered in California." 465 U.S. at 788, 104 S.Ct. 1482 (footnote omitted).[8] "The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California [was] the focal point both of the story and of the harm suffered." Id. at 788-89, 104 S.Ct. 1482. At the time of the alleged wrongdoing in Calder, there was an identifiable plaintiff, whose injury was foreseeable and directly traceable to the defendants' conduct.
At the time of the alleged erroneous securities filing in this case, the individual plaintiffs were unidentified and unidentifiable. Unlike Calder, here there was no foreseeable harm to any particular plaintiff. Moreover, similar filings were sent to the securities commissions of at least 18 other states, whose residents are also involved in this litigation. Indeed, according to the *533 unrefuted allegations, Dill filed the Form-D notice only in states to which it was directed by those of the respondents who were also Developers, that is, in those states in which the Developers proposed to sell the Southwestern bonds. Moreover, it was not Dill or Matsukage, but the respondents, or some of them, who sold the securities in Alabama. Thus, to the extent Alabama was "targeted," it was targeted by the respondent-Developersnot by Dill or Matsukage.
However, personal jurisdiction must rest on the "purposeful" conduct of the defendant, not on the "unilateral activity" of the plaintiff or third parties. Elliott v. Van Kleef, 830 So.2d at 731; see also Burger King Corp. v. Rudzewicz, 471 U.S. at 475, 105 S.Ct. 2174; Ex parte Kamilewicz, 700 So.2d 340, 343 (Ala.1997). Because the blue-sky filings were not precipitated by Dill or Matsukage or directed specifically at identified, or identifiable, Alabama residents, the "purposeful-availment requirement" of due process is absent, and the Calder effects test is not satisfied.
In this connection, we also reject the respondents' assertion that Dill is "registered with the Alabama Securities Commission as [an] agent for process of service of Southwestern." Respondents' Brief, at 48. In so stating, the respondents mischaracterize the substance of the consent form. The consent form actually designates, pursuant to Ala.Code 1975, § 8-6-12(e)(1),[9] the secretary of state, not Dill, as the agent for process. Dill merely requested an informational "copy of any notice, process or pleading served [thereunder]."
In short, we conclude that, based on this one, isolated contact with Alabamaat the instance of the respondents-Developers Dill and Matsukage could not "`reasonably anticipate being haled into court [here].'" Dillon Equities v. Palmer & Cay, Inc., 501 So.2d at 462. Because the exercise of specific personal jurisdiction over these out-of-state defendants, pursuant to Rule 4.2(a)(2)(I), would offend due process, we pretermit discussion of the respondents' arguments based on Rule 4.2(a)(2)(A)-(D).
This conclusion is not inconsistent with Gilford Partners v. Pizitz, 630 So.2d 404 (Ala.1993), on which the respondents place considerable reliance. That case involved an action by Richard Pizitz, Merritt Pizitz, Jill Pizitz, Richard Pizitz, Jr., Susan Pizitz Bosshard, and the Pizitz Family Investment Partnership IX against out-of-state defendants Gilford Partners, H. Robert Holmes, Holmes-Gilford General Partners, and Gilbrooke Associates, Inc. Id. at 405. The action arose out of the sale in Alabama by Gilford Partners "of an unregistered security to the ... Pizitz Family Investment Partnership IX." Id. The plaintiffs alleged:
"(1) that the defendants had failed to register the limited partnership interest in Gilford Partners, in violation of § 8-6-4[, Ala.Code 1975]; (2) that Holmes and Holmes-Gilford had failed to register as agent and dealer, respectively, in violation of § 8-6-3; and (3) that the defendants had made misrepresentations and omissions in information sent to the plaintiffs, in violation of § 8-6-17."
630 So.2d at 405.
The trial court denied the defendants' motion to dismiss for lack of in personam *534 jurisdiction and granted a partial summary judgment against Gilford Partners. The trial court concluded that "nonresident defendants who unlawfully sell unregistered securities in the forum state subject themselves to personal jurisdiction in the state in actions to enforce statutory remedies for such unlawful sales." Id. Gilford Partners appealed.
This Court affirmed the judgment of the trial court, holding that jurisdiction was proper, under Rule 4.2(a)(2)(C) ("causing tortious injury or damage by an act or omission in this state"). The "act or omission" was, of course, the sale in Alabama by Gilford Partners of the unregistered security. The Court explained:
"The court in Florendo v. Pan Hemisphere Transport, Inc., 419 F.Supp. 16 (N.D.Ill.1976), found that the defendants in that case, who had failed to register the security sold to the plaintiff, `[had] subjected themselves to the jurisdiction of [the Illinois] court. Because the injury... took place in Illinois, that state was the situs of the tortious act.' 419 F.Supp. at 18. The court further stated that exercising jurisdiction did not offend the `traditional notions of fair play and substantial justice,' because the defendants should have foreseen the possibility of being sued in the Illinois forum. Id. at 18-19. The district court held that an action such as that against the defendants was foreseeable because `[the] defendants [had] sold an interest in a limited partnership to a specifically identified purchaser residing in Illinois.' The court added that `[i]t [was] certainly fair under the circumstances to require them to litigate a controversy concerning that sale in Illinois.' Id. at 19."
630 So.2d at 406 (emphasis added).
Pizitz is distinguishable in at least two fundamental respects. There, the out-of-state defendant had sold the unregistered securities to a "specifically identified purchaser." Pizitz would be on point with this case if Dill or Matsukage had sold any of the Southwestern bonds, but they did not. A fortiori, Dill and Matsukage made no sales to any "specifically identified purchaser." Here, the issuers and the sellers are plaintiffs, who are suing Dill and Matsukage for, among other things, professional malpractice arising out of services performed entirely from Colorado. Cf. Porter v. Berall, 142 F.Supp.2d at 1147 ("the clearly compelling body of law regarding lawyer malpractice confines personal jurisdiction to the situs of the acts and omissions complained of"). Pizitz does not, therefore, aid the respondents.
Finally, the respondents devote considerable discussion to "the securities lawyers' role in securities offerings." Respondents' Brief, at 27-35. This discussion, however, merely confuses personal jurisdiction with potential liability. This distinction was succinctly illustrated in Sher v. Johnson, 911 F.2d at 1365: "Liability and jurisdiction are independent. Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum."

IV. Summary
In summary, Dill and Matsukage's single relevant contact with Alabama was the blue-sky filing. At the times material to this case, they neither represented, nor dealt directly with, any Alabama resident. Dill and Matsukage performed all services for Bellwether and Southwestern from Colorado. Grounds for general jurisdiction are absent, and Dill and Matsukage's sole contact with Alabama does not satisfy the effects test, as a basis for specific jurisdiction.
*535 The trial court erred, therefore, in denying Dill and Matsukage's motion to dismiss the respondents' claims against them in these actions for lack of in personam jurisdiction. Because Dill and Matsukage have demonstrated that they are entitled to the relief they seek, we grant the petition, and issue the writ of mandamus.[10]
PETITION GRANTED; WRIT ISSUED.
BROWN, HARWOOD,[11] and STUART, JJ., concur.
LYONS, J., concurs specially.
JOHNSTONE, J., concurs in part and dissents in part.
MOORE, C.J., and HOUSTON and SEE, JJ., dissent.
LYONS, Justice (concurring specially).
I concur in the main opinion. I write specially to address further the issue of specific jurisdiction.
Federal securities laws permit jurisdiction over nonresidents by providing for extraterritorial service of process. See 15 U.S.C. §§ 77v and 78aa. Consequently, questions of in personam jurisdiction in such cases do not arise. This case, arising under state law, presents the infrequently addressed question of personal jurisdiction over a nonresident defendant in a securities case.
The blue-sky filing prepared by Dill, Dill, Carr, Stonbraker & Hutchings, P.C., on behalf of its client was directed to the Alabama Securities Commission, informing it of the sale of securities to be sold by a third party to Alabama citizens. The plaintiffs are alleged victims of sales by a third party, which, they say, would never have been allowed had Dill and Fay Matsukage, one of its attorneys, not been guilty of negligence in connection with the filing.
The immediate "target" of the filing is the Alabama Securities Commission. However, it is not the party seeking to assert in personam jurisdiction over Dill and Matsukage. Only because of the conduct of the third-party seller are Dill and Matsukage now defendants. That Dill and Matsukage may be legally responsible to the purchasers based on the theory that they should have reasonably anticipated that purchasers would rely to their detriment on the filing in sales to them by a third party should not be determinative of the threshold question of the court's jurisdiction over Dill and Matsukage. To recognize such a circumstance as relevant would permit jurisdiction to be grounded upon the purposeful conduct of a third party, contrary to settled precedent. See Elliott v. Van Kleef, 830 So.2d 726 (Ala. 2002), and the cases cited therein.
Because the purposeful conduct of Dill and Matsukage was not directed to any of the plaintiffs seeking to invoke personal jurisdiction over them, I concur in the main opinion's conclusion that the circuit court does not have specific jurisdiction over Dill and Matsukage; to hold otherwise would violate due process.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I respectfully dissent insofar as the main opinion decides that this Court will issue a *536 writ of mandamus directing the trial judge to dismiss the claims of the Alabama resident plaintiffs who bought the Southwestern bonds. These particular plaintiffs bought the Southwestern bonds as a result of Dill and Matsukage's having:
1. authored and effected the false "blue-sky" filing for the Southwestern bonds;
2. compiled, authored, and supplied the false offering statement for the Southwestern bonds;
3. authored and supplied the Southwestern bonds themselves, which contained false statements; and
4. reviewed and approved twelve Alabama resident plaintiffs' respective subscription agreements before those plaintiffs purchased their respective Southwestern bonds.
At the time of Dill and Matsukage's torts they knew their tortious conduct was injuring or would injure Alabama residents. These facts justify the exercise of specific personal jurisdiction over Dill and Matsukage by the Alabama courts for the claims of the Alabama residents who sold or bought Southwestern bonds. To this extent I concur in Justice Houston's and Justice See's respective dissents and in their respective citations to authority.
Simply as a matter of legal reasoning, I respectfully disagree with a couple of apparent non sequiturs in the main opinion. I will discuss each in turn.
First, the main opinion says that, if the filing of the Southwestern Form-D notice with the Alabama Securities Commission does not "form[ ] a basis for the exercise of specific jurisdiction," "then, a fortiori, it does not give rise to general jurisdiction." 866 So.2d at 531. Specific jurisdiction differs from general jurisdiction in that specific jurisdiction depends on a causal relation between the contact with the forum state and the claim in the forum. Enough contacts with no causal relation to the claim can support general jurisdiction even though not specific jurisdiction. Therefore, I am concerned that the use of the expression "a fortiori" in the main opinion suggests that an absence of support for specific jurisdiction necessarily means an absence of support for general jurisdiction.
Second, the main opinion says, "Because the exercise of specific personal jurisdiction over these out-of-state defendants, pursuant to Rule 4.2(a)(2)(I), would offend due process, we pretermit discussion of the respondents' arguments based on Rule 4.2(a)(2)(A)-(D)." 866 So.2d at 533. This statement implies that jurisdiction under subsections (A) through (D) depends on jurisdiction under subsection (I). Jurisdiction, however, may exist under any one of these subsections even in the absence of jurisdiction under any of the others.
I note also that, in the discussion of general jurisdiction, the main opinion quotes United Electrical, Radio & Machine Workers of America v. 163 Pleasant Street Corp., 960 F.2d 1080, 1089 (1st Cir. 1992), for the proposition that "in a contract case, the defendant's forum-based activities must be `instrumental in the formation of the contract.'" 866 So.2d at 529. This language seems more applicable to specific jurisdiction than to general jurisdiction.
In all other respects I concur in the main opinion. I agree that the materials before us do not reveal a basis for the exercise of general personal jurisdiction over Dill and Matsukage for the claims of any of the plaintiffs and do not reveal a basis for the exercise of specific personal jurisdiction over Dill and Matsukage for the claims of any plaintiffs except the Alabama residents who sold or bought Southwestern bonds.
*537 HOUSTON, Justice (dissenting).
In International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the United States Supreme Court held:
"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'"
The International Shoe "minimum-contacts" standard may be met in either of two ways: by a defendant's subjecting itself to either the general jurisdiction or the specific jurisdiction of a forum state. I address only specific jurisdiction, which exists when the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and/or has "`purposefully directed' his activities at residents of the forum, ... and the litigation results from alleged injuries that `arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), and Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).
Dill, Dill, Carr, Stonbraker & Hutchings, P.C. ("Dill"), and Fay Matsukage, for lucre, filed in Alabama a Form-D Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exemption ("Form-D notice"), accompanied by a Form U-2 Uniform Consent to Service of Process. If this document had not been filed in Alabama, bonds issued by Southwestern Holdings, L.L.C., could not have been sold in Alabama. In my opinion, attorneys who prepare and file a Form-D notice in Alabama should anticipate being haled into court in Alabama in connection with the bond offering the notice pertains to, if the bond offering that follows the filing of the Form-D notice in Alabama is fraudulent, no matter where the forms are prepared or how they get to Alabama (personal filing or mailing).
Nineteen Alabama residents have allegedly been damaged in excess of $2.5 million in connection with bonds issued by Southwestern Holdings, L.L.C.,[12] as a result of Dill and Matsukage's acts and omissions that were allegedly knowingly and deliberately aimed at Alabama residents. From December 1998 through March 1999, Dill and Matsukage received facsimile transmissions from Southwestern Holdings, L.L.C., specifying the names and amount of investment of the Alabama plaintiffs, who purchased bonds as a result of Dill and Matsukage's activity directed at Alabama residents. The earliest dated facsimile involved a $210,000 investment by the plaintiff Allen Franklin. In it, Dill and Matsukage were asked to "review his Subscription Agreement and Purchaser Questionnaire and let me know if everything is okay." Dill and Matsukage knew that the seeds they sowed in Alabama were bearing fruit, and they knew the names of, and amount of potential loss to, the Alabama victims.
SEE, Justice (dissenting).
I respectfully dissent.
*538 Dill, Dill, Carr, Stonbraker & Hutchings, P.C., a Colorado law firm, and Fay Matsukage, an attorney at that law firm (hereinafter referred to collectively as "Dill"), petitioned this Court for a writ of mandamus directing the trial court to dismiss for lack of personal jurisdiction the actions brought against them by Allen Austin and by Mary Champion. This Court grants the petition.
Troutman Sanders, LLP, another law firm and a codefendant of Dill, separately petitioned this Court for a writ of mandamus directing the trial court in these actions to dismiss the 230 foreign plaintiffs on forum non conveniens grounds. This Court found Troutman's petition to be procedurally barred because it was untimely. Ex parte Troutman Sanders, LLP, 866 So.2d 547 (Ala.2003).[13]
The "developers," 11 people from around the country, including James Norton of Alabama, organized an investment plan pursuant to which they would sell securities through private placements and invest the proceeds from the placements of the securities in companies owned by Richard Homa and Michael Gause. Homa and Gause owned several companies that operated a number of "Cash 4 Titles" stores. In February 1998, a number of the developers created Bellwether Holdings, L.L.C. (hereinafter referred to as "Bellwether"), through which they intended to issue 270-day promissory notes. Dill reviewed the securities offering and handled the necessary filings to complete the private placement.
In June 1998, the developers formed Southwestern Holdings, L.L.C. (hereinafter referred to as "Southwestern"); they intended to issue through Southwestern seven-year bonds that they would market through private placements. Dill drafted the offering documents and made all the necessary filings to complete the private placements. Dill's billing records indicate that as part of this process, Dill researched Alabama law and filed with the Alabama Securities Commission an instrument styled "Form-D Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or uniform limited offering exemption." Dill's billing records indicate that in order to prepare the Form-D Notice, Dill created spreadsheets that contained, along with other information, information about all of the people who lived in Alabama and had subscribed to the placement. On the Form-D Notice, Dill indicated the number of individuals in Alabama who had subscribed to the private placement at the time of filing. Dill also performed the due-diligence investigation on the "Cash 4 Titles" operations in order to ensure that all the material representations in the Southwestern offering were true. Dill also reviewed the subscription agreements submitted by potential Alabama purchasers of the Southwestern bonds to ensure that those agreements complied with federal and Alabama securities laws.
In October 1999, the United States Securities and Exchange Commission discovered that Homa and Gause were operating a Ponzi scheme. That is, instead of using the money from outside investors like Bellwether and Southwestern to fund the "Cash 4 Titles" stores, Homa and Gause were using the money to pay interest to other investors and to fund their own lavish lifestyles. The SEC subsequently brought criminal charges against Homa and Gause.
On April 27, 2001, Bellwether, Southwestern, 8 of the developers, and 19 other *539 individuals, including Mary Champion (hereinafter referred to as "the Champion plaintiffs"), filed an action in Shelby County, Alabama, against Dill, alleging breach of contract, common-law fraud, breach of fiduciary duty, professional malpractice, negligent supervision, and violations of securities laws of the 17 states in which the Bellwether and Southwestern securities were sold. On May 11, 2001, the Champion plaintiffs filed an amended complaint, naming 135 additional plaintiffs. On September 12, 2001, another group of plaintiffs, including Allen Austin (hereinafter referred to as "the Austin plaintiffs"), filed an action in Shelby County against Dill, alleging violations of securities laws in 11 states, and breach of contract, common-law fraud, breach of fiduciary duty, professional malpractice, and improper supervision. On March 1, 2002, Dill moved to dismiss both actions on the ground that the Shelby Circuit Court lacked personal jurisdiction over it. The trial court denied Dill's motion. Dill now petitions this Court for the writ of mandamus directing the trial court to dismiss the actions for lack of personal jurisdiction.
The Champion plaintiffs and the Austin plaintiffs, the respondents here, argue that Alabama courts have personal jurisdiction, both general and specific, over Dill in the actions brought by both Alabama and out-of-state plaintiffs concerning both the Bellwether and Southwestern offerings. Dill argues that, as a Colorado law firm, it lacks the continuous or systematic contacts with Alabama that would give rise to general personal jurisdiction; it also argues that its limited actions in support of a securities offering lack a sufficient nexus with Alabama to give rise to specific personal jurisdiction in an Alabama court over Dill with respect to any plaintiff who may have purchased the securities.
Personal jurisdiction is the power of a court over a natural or legal person to enforce legal obligations on that person. Traditionally a court's jurisdiction extended to persons or property within its physical control. In International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court of the United States stated that a court's personal jurisdiction reaches persons who have maintained minimum contacts with a jurisdiction so that the court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. 326 U.S. at 316, 66 S.Ct. 154.
"Alabama's long-arm rule, Rule 4.2(a)(2)(I),[Ala.] R. Civ. P., extends the jurisdiction of this state's courts to the permissible limits of due process." Martin v. Robbins, 628 So.2d 614, 617 (Ala. 1993). "This Court has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution." Elliott v. Van Kleef, 830 So.2d 726, 730 (Ala.2002). An Alabama court has personal jurisdiction over Dill if Dill's contacts with Alabama are such that it "should reasonably anticipate being haled into [an Alabama] court." Dillon Equities v. Palmer & Cay, Inc., 501 So.2d 459, 462 (Ala.1986). When a party "`purposefully avails itself of the privilege of conducting activities within the forum State' ... it has clear notice that it is subject to suit there...." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)(quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).
Personal jurisdiction may be general or specific. See Elliott, 830 So.2d at 730. Contacts that give rise to general personal jurisdiction are contacts that are both continuous *540 and systematic, though generally unrelated to the cause of action. Id. On the other hand,
"Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, [the] `fair warning' requirement is satisfied if the defendant has `purposefully directed' his activities at the residents of the forum, and the litigation results from alleged injuries that `arise out of or relate to' those activities."
Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)(footnote and citations omitted).
Dill's actions in this case give rise to specific jurisdiction. Dill drafted the offering documents and made all of the necessary filings to complete the private placements in the Southwestern offering. Dill's billing records indicate that it researched questions concerning Alabama securities and usury law, and that it filed an instrument styled "Form-D Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or uniform limited offering exemption" with the Alabama Securities Commission (the "blue-sky" filing). Dill's billing records also indicate that in order to prepare the blue-sky filing, it created spreadsheets that contained detailed information about all of the Alabama residents who had subscribed to the Southwestern offering. Dill acquired information from the Alabama subscribers in order to complete the spreadsheets and the blue-sky filing that permitted the Southwestern bonds to be offered to Alabama residents. As attorneys, Dill was aware that all of this was done to enable the offering to be made to Alabama citizens.
Dill's actions constitute the type of "purposefully directed" activity that traditionally gives rise to specific jurisdiction. World-Wide Volkswagen, 444 U.S. at 297-98, 100 S.Ct. 559 ("The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.").
In Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court of the United States explained:
"Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."[14]
In Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), Shirley Jones, an actress and a resident of California, brought in the California courts a defamation action against Florida residents and National Enquirer employees, Iain Calder and John South, based on an article written by South in Florida, published by the National Enquirer in Florida, and distributed by the National Enquirer in California. Calder and South argued that a California court could not assert personal jurisdiction over them because their employer, and not they, targeted the magazine at California. Calder and South
*541 "liken[ed] themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California. [Calder and South argued that] [c]ases which hold that jurisdiction will be proper over the manufacturer should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant State."
465 U.S. at 789, 104 S.Ct. 1482 (citations omitted). The Supreme Court of the United States held in Calder:
"Petitioners' analogy does not wash. Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious actions were expressly aimed at California."
465 U.S. at 789, 104 S.Ct. 1482.
Here, Dill authored a blue-sky filing designed and intended to allow the Southwestern bonds to be marketed in Alabama. Dill obtained information on the Alabama investors and qualified them for the private placement so that a portion of the Southwestern bonds could be placed in Alabama.
The majority, nonetheless, finds that Dill lacked contacts with Alabama sufficient to give specific jurisdiction, stating:
"At the time of the alleged erroneous securities filing in this case, the individual plaintiffs were unidentified and unidentifiable. Unlike Calder, here there was no forseeable harm to any particular plaintiff. Moreover, similar filings were sent to the securities commissions of at least 18 other states, whose residents are also involved in this litigation. Indeed, according to the unrefuted allegations, Dill filed the Form-D notice only in states to which it was directed by those of the respondents who were also Developers, that is, in those states in which the Developers proposed to sell the Southwestern bonds."
866 So.2d at 532-33 (emphasis in original).[15]
In fact, at the time of the "alleged misfiling," Dill knew the names of all of the individuals who at that time had subscribed to the Southwestern placement, and it listed information about those particular investors on the Form-D notice it filed with the Alabama Securities Commission. Dill also knew who the Alabama principals in the LLCs were, and those principals are plaintiffs in this action. This is precisely the type of "individualized targeting" the United States Court of Appeals for the Ninth Circuit found in Bancroft & Masters, Inc. v. Augusta National Inc., 223 F.3d 1082, 1088 (9th Cir.2000)(applying Calder and cited with approval in the majority opinion on this point), to indicate that a party has purposefully availed itself of a forum's laws so that the exercise of personal jurisdiction would not violate due process. In Bancroft & Masters, The Ninth Circuit Court of Appeals found "purposeful availment" in cases
"holding that specific jurisdiction existed in light of evidence of `targeting' of the plaintiff, who was a forum resident[,] ... holding that specific jurisdiction existed where defendant performed foreign acts for the purpose of having their consequences felt in the forum state[,] ... [and] finding purposeful availment where forum effect of a foreign act `was not only foreseeable, it was contemplated and bargained for.'" *542 223 F.3d at 1088 (citations omitted). While the majority states that Dill acted merely at Southwestern's direction, Dill unquestionably with knowledge that it was doing socompleted the due-diligence investigation, researched questions of Alabama law, and prepared the blue-sky filing so that Southwestern bonds could be sold in Alabama. Dill also knew that the consequences of its actions would be felt in Alabama by the individuals whose Southwestern subscription agreements it reviewed and approved. That Dill made filings in 18 other states does not deprive Alabama of specific jurisdiction; it suggests, instead, that 18 other states mayif their long-arm statutes permitalso assert personal jurisdiction over Dill.[16]
Nor does the alleged fact that the developers "directed" Dill to make filings in particular states insulate Dill from an Alabama court's exercise of jurisdiction over Dill. The Supreme Court of the United States indicated a rejection of that argument when it held in Calder that Calder and South's "status as employees does not somehow insulate them from jurisdiction," because "[e]ach defendant's contacts with the forum State must be assessed individually." 465 U.S. at 790, 104 S.Ct. 1482. The Supreme Court rejected Calder and South's argument that "[a] reporter and an editor ... have no direct economic stake in their employer's sales in a distant State. Nor are ordinary employees able to control their employer's marketing activity." 465 U.S. at 789, 104 S.Ct. 1482. Dill may not have controlled where Southwestern chose to sell its bonds; nevertheless, Dill prepared the legal documents using information about Alabama residents, acquired from Alabama residents, targeted at Alabama residents, and distributed to Alabama residents by Southwestern. The test in Calder is not which party chose to target the forum; the test is whether the actions taken by the party being sued were directed at the forum state. See id. Dill was researching Alabama law, compiling lists of Alabama subscribers, and making filings with the Alabama Securities Commission to enable Southwestern to sell bonds in Alabama.
The majority notes that "personal jurisdiction must rest on the `purposeful' conduct of the defendant, not on the `unilateral activity' of the plaintiff or third parties." 866 So.2d at 533 (emphasis in original) (quoting Elliott v. Van Kleef, 830 So.2d 726, 731 (Ala.2002); and citing Burger King, 471 U.S. at 475, 105 S.Ct. 2174). However, this Court has held in Ex parte Lagrone, 839 So.2d 620, 625 (Ala.2002), that a person is subject to personal jurisdiction in Alabama based on actions taken outside of Alabama at the direction of a third party, when those actions are directed ultimately at Alabama.
In Lagrone this Court held that Fisher Products, Inc., a Georgia corporation that never advertised in Alabama, that never directly solicited business in Alabama, and that never sent employees to Alabama for business purposes, was nevertheless subject to the general jurisdiction of the Alabama courts when it "made 17 shipments of its products, totaling $15,296.98, to Alabama customers at Norco's instruction." 839 So.2d at 627. This Court noted:
"Fisher Products placed its products into the stream of commerce, with not *543 only the `expectation' but with the actual knowledge that the products would be purchased by consumers in this State.... Fisher Products knew that those 17 shipments were being sold to Alabama customers. Thus, in light of those shipments, Fisher Products `"should reasonably [have] anticipate[d] being haled into court [in Alabama]."'" 839 So.2d at 627-28 (quoting Burger King, 471 U.S. at 474, 105 S.Ct. 2174, quoting in turn World-Wide Volkswagen, 444 U.S. at 295, 100 S.Ct. 559). The Supreme Court stated in Burger King: "So long as it creates a `substantial connection' with the forum, even a single act can support jurisdiction." 471 U.S. at 476 n. 18, 105 S.Ct. 2174.
Dill worked on the Southwestern offering; Dill drafted the offering documents with not only with the expectation, but also the actual knowledge ultimately that 12 Alabama residents had subscribed to purchase over $2 million of Southwestern bonds.[17] Therefore, based on Dill's actions in conjunction with the Southwestern offering, an Alabama court can exercise personal jurisdiction over Dill in this case.
"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with `fair play and substantial justice.'"
Burger King, 471 U.S. at 476, 105 S.Ct. 2174. "For a nonresident defendant who has purposefully directed his activities at Alabama residents to defeat personal jurisdiction, `he must present a compelling case that the existence of some other considerations would render jurisdiction unreasonable.' " Lagrone, 839 So.2d at 628 (quoting Burger King, 471 U.S. at 477, 105 S.Ct. 2174). Dill argues that "Alabama has less interest in adjudicating this dispute than [do] other states, such as Colorado, where the acts of [Dill] are alleged to have taken place and where at least 30 of the plaintiffs reside [and] Alabama's interest in adjudicating this dispute is no greater than any of the eighteen other states within which the various plaintiffs reside...." (Petition at 35.) The respondents counter that because Alabama residents have lost over $2 million on Southwestern and $800,000 on Bellwether, Alabama has an interest in adjudicating this dispute. The respondents also argue that Dill would have defeated the purpose of Alabama's blue-sky laws if this Court holds that a law firm that made a blue-sky filing in Alabama was not subject to personal jurisdiction in Alabama *544 in an action that arises directly from that filing.
Dill's argument that Colorado and perhaps 18 other states have more interest than does Alabama in providing a forum for injured Alabama residents has little intuitive appeal. If we accept Dill's argument that Colorado has an interest in providing a forum for the 30 Colorado plaintiffs, it would seem apparent that Alabama has a similar interest in protecting its citizens. And Alabama has an interest in holding accountable those who submit filings under Alabama's blue-sky laws. Dill has not presented a "`compelling case that the existence of some other considerations would render jurisdiction unreasonable.'" Lagrone, 839 So.2d at 628 (quoting Burger King, 471 U.S. at 477, 105 S.Ct. 2174).
This case presents another issue not directly addressed by the majority, but addressed by Justice Johnstone in his special writing: whether the exercise of specific jurisdiction over Dill by an Alabama court in the action brought by Alabama plaintiffs entitles an Alabama court to exercise jurisdiction over Dill in the actions brought by the out-of-state plaintiffs. This question has been addressed by the federal courts:
"Pendent personal jurisdiction, like its better known cousin, supplemental [or pendent] subject matter jurisdiction, exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim.... In essence, once a district court has personal jurisdiction over a defendant for one claim, it may `piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction."
United States v. Botefuhr, 309 F.3d 1263, 1272 (10th Cir.2002).
Questions of pendent personal jurisdiction arise in federal court when a district court exercises personal jurisdiction over a defendant under a federal statute that allows for nationwide service of process, and the district court then attaches additional claims over which it may not otherwise have personal jurisdiction.[18] Alternatively, pendent personal jurisdiction issues arise in diversity actions in which the district court exercises personal jurisdiction over a defendant pursuant to the forum state's long-arm statute or rule. 4A Charles Alan Wright & Arthur A. Miller, Federal Practice & Procedure § 1069.7 (3d ed.2002).
Charles Alan Wright and Arthur A. Miller conclude that no state court opinion "ever has articulated a pendent personal *545 jurisdiction policy...." Federal Practice & Procedure § 1069.7. "The Supreme Court [of the United States] has not considered whether the scope of specific personal jurisdiction is broad enough to permit the exercise of pendent personal jurisdiction" by a state; however, the United States Courts of Appeals for the "Second, Third, Fourth, Seventh, and the District of Columbia Circuits have considered and applied the doctrine," and the majority of the more than 50 decisions by federal district courts that have considered the doctrine have upheld it. Linda Sandstrom Simard, Exploring the Limits of Specific Personal Jurisdiction, 62 Ohio St. L.J. 1619, 1625-26 (2001)(footnotes omitted). See also Botefuhr, 309 F.3d at 1273 ("the majority of federal district courts and every circuit court of appeals to address the question have upheld the application of pendent personal jurisdiction").
Moreover, federal district courts have freely exercised pendent personal jurisdiction under state long-arm statutes. In Salpoglou v. Widder, 899 F.Supp. 835, 837-38 (D.Mass.1995), the court observed:
"Widder correctly contends that even if subject matter jurisdiction exists, this court cannot exercise personal jurisdiction over him unless the requirements of the Massachusetts long-arm statute are satisfied. The requirements of that statute cannot be satisfied as to the malpractice claim because the two operations performed by Widder took place in Virginia. However, where a Court has subject matter jurisdiction over both the malpractice and the breach of contract claims, it may obtain personal jurisdiction based on either of the claims pursuant to the doctrine of pendent personal jurisdiction."
In Miller v. SMS Schloemann-Siemag, Inc., 203 F.Supp.2d 633 (S.D.W.Va.2002), the federal district court used the full reach of West Virginia's long-arm statute and due process to bring a Pennsylvania corporation into court in West Virginia over acts that took place in Korea. In Miller, SMS, through a subcontractor, hired Charles Miller to repair a steel furnace in South Korea. While Miller was completing the work, a malfunction caused molten steel to spill on Miller. The steel burned Miller over two-thirds of his body. Miller's wife, Donna, insisted that SMS evacuate Miller to the United States where state-of-the-art burn treatment was available. SMS agreed to pay to transport Miller if Donna Miller would sign a release. Donna Miller signed the release. Miller later died and Donna Miller sued SMS, alleging among other claims, the intentional infliction of emotional distress. SMS moved to dismiss the claims for lack of personal jurisdiction. The district court found that the agreement signed in Korea compelled Donna Miller to take actions[19] in West Virginia that contributed to her emotional distress. Once the district court concluded that it had personal jurisdiction over claims arising from the release, it found that it could exercise pendent personal jurisdiction over "all of the claims sharing a common nucleus of operative fact." 203 F.Supp.2d at 642-43. The court reasoned that analysis of pendent personal jurisdiction under a state's long-arm statute is the same as the analysis of the issue where a court exercises pendent personal jurisdiction under a federal statute authorizing nationwide service of process:
"ESAB [Group, Inc. v. Centricut, Inc., 126 F.3d 617 (4th Cir.1997),] recognized pendent personal jurisdiction over state *546 law claims when a district court has first obtained personal jurisdiction over a defendant by reason of a federal claim authorizing nationwide service of process. A careful reading of the underlying analysis in ESAB, however, demonstrates it would also apply to reach all state law claims in an action where (1) jurisdiction is approved for at least one substantial state claim; and (2) all of the claims arise from a common nucleus of operative fact."
203 F.Supp.2d at 643 n. 7.
Similarly, the claims in this case come to us, not under a statute that authorizes nationwide service of process, but under Alabama's long-arm rule. Applying the principle of pendent personal jurisdiction to Dill, once the plaintiffs establish that an Alabama court has personal jurisdiction over Dillthat is, that an Alabama court has power over the person of Dillin regard to the Southwestern bond issue, an Alabama court may exercise that power over Dill as to all other claims that arise from a common nucleus of operative fact.[20]
Dill's argument that an Alabama court's assertion of personal jurisdiction over Dill violates traditional notions of "fair play and substantial justice," Burger King, 471 U.S. at 476, 105 S.Ct. 2174, does not defeat Alabama's extension of personal jurisdiction over the claims raised by out-of-state plaintiffs. The Supreme Court of the United States noted that when a defendant argues that other considerations make the extension of personal jurisdiction unreasonable, "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, ... a defendant claiming substantial inconvenience may seek a change of venue." Burger King, 471 U.S. at 477, 105 S.Ct. 2174.
Alabama addresses this very concern through the strict application of the doctrine of forum non conveniens. Alabama statutes provide that once a claim
"has arisen outside this state against any person or corporation, such claim may be enforceable in the courts of this state in any county in which jurisdiction of the defendant can be legally obtained... provided, however, the courts of this state shall apply the doctrine of forum non conveniens in determining whether to accept or decline to take jurisdiction of an action based upon such a claim originating outside this state; and provided further that, if upon motion ... it is shown that there exists a more appropriate forum outside this state ... the court must dismiss the action without prejudice."
§ 6-5-430, Ala.Code 1975. If Dill believes that the presence of plaintiffs from 18 other states makes this case unworkable, Dill's proper "remedy" would be to move the trial court to dismiss the action, or portions of the action, not for lack of personal jurisdiction over Dill, but on forum non conveniens grounds where particular claims raised by particular defendants may more appropriately be addressed in another *547 forum.[21] Thus, an Alabama court does not violate traditional notions of fair play and substantial justice when it extends personal jurisdiction over Dill in the actions brought by the out-of-state plaintiffs.
This Court, therefore, should hold that the trial court did not err in holding that it could exercise personal jurisdiction over Dill as to all the claims arising out of the common nucleus of operative fact; therefore, I dissent.[22]
NOTES
[1] Matsukage avers that she never undertook to "represent [Bellwether] in any regard." Affidavit of Fay Matsukage.
[2] The phrase "blue sky" "originated with an early description of the purpose of state security laws as protecting investors against `speculative schemes which have no more basis than so many feet of blue sky.'" Gilford Partners v. Pizitz, 630 So.2d 404, 406 n. 3 (Ala.1993).
[3] "The term `[P]onzi scheme' refers to an investment scheme whereby returns to investors are financed, not through the success of an underlying business venture, but from the principal sums of newly attracted investors.... Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, attracting additional investors." In re Primeline Sec. Corp., 295 F.3d 1100, 1104 n. 2 (10th Cir.2002).
[4] Those states were Alabama, Arizona, California, Colorado, Florida, Georgia, Iowa, Kansas, Kentucky, Michigan, Nebraska, Nevada, North Carolina, Pennsylvania, South Carolina, Tennessee, and Washington.
[5] The additional states were Ohio and Virginia. Consequently, this litigationboth Champion and Austinimplicates the securities laws of 19 states.
[6] Consequently, this action must be distinguished from those commenced in federal courts, pursuant to the Securities Exchange Act of 1934, codified as amended, 15 U.S.C. § 78a et seq. Section 78aa provides for exclusive federal jurisdiction and nationwide service of process. See Busch v. Buchman, Buchman & O'Brien, 11 F.3d 1255, 1258 (5th Cir.1994) ("when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States").
[7] As we noted previously, Matsukage denies representing anyone in connection with the Bellwether promissory-note offering. To that extent, there is a conflict in the evidence. For purposes of a personal-jurisdiction analysis, when the allegations of the complaint are contradicted by the defendant's affidavits, courts "`construe all reasonable inferences in favor of the plaintiff.'" Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 255 (11th Cir. 1996) (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)).
[8] The article alleged that the plaintiff, an actress, "drank so heavily as to prevent her from fulfilling her professional obligations." 465 U.S. at 789 n. 9, 104 S.Ct. 1482.
[9] Section 8-6-12(e)(1) provides, in pertinent part: "[E]very issuer which proposes to offer a security in this state ... shall file with the security commission ... an irrevocable consent appointing the Secretary of State to be his attorney to receive service of any lawful process ... with the same force and validity as if served personally on the person filing the consent."
[10] The respondents invite this Court to condition its writ of mandamus on an agreement by Dill and Matsukage to waive any statute-of-limitations defense they may have in a Colorado action. However, the respondents cite nothing that would authorize such an order. Therefore, we decline the invitation.
[11] Justice Harwood was not present at oral argument, but he has listened to the audiotapes of the arguments.
[12] I do not address whether Alabama would have personal jurisdiction of Dill and Matsukage as a result of their actions and/or omissions in connection with the Bellwether Holdings, L.L.C., offering, in which seven Alabama residents allegedly lost in excess of $527,000.
[13] I dissented in Ex parte Troutman Sanders, LLP.
[14] The Supreme Court held in Asahi that California could not exercise jurisdiction over Asahi because "[t]here [was] no evidence that Asahi designed its product in anticipation of sales in California." 480 U.S. at 113, 107 S.Ct. 1026.
[15] Justice Lyons concurs, stating that "the purposeful conduct of Dill and Matsukage was not directed to any of the plaintiffs."
[16] Nowhere does the majority or Dill cite any authority for the proposition that personal jurisdiction must be exclusive to a single state. Cf. Pollution Prevention Servs. Inc. v. Inter Recycling, Inc., (No. 96-54-Civ-T-17A, July 1, 1996)(M.D.Fla.1996)(not published in F.Supp.)(denying a motion to transfer on forum non conveniens grounds and finding the exercise of personal jurisdiction valid in Florida, notwithstanding the pendency of an action in a Texas court arising from the same set of operative facts).
[17] In Lagrone, Lagrone sued Fisher Products seeking damages for injuries he suffered when he was struck in the head by a pneumatic jack manufactured by Fisher Products. The jack that struck Lagrone was not one of the 17 jacks shipped directly to Alabama by Fisher Products. A court may exercise specific jurisdiction over an individual only when there is a "`"clear, firm nexus between the acts of the defendant and the consequences complained of."'" Lagrone, 839 So.2d at 625 (quoting Elliott v. Van Kleef, 830 So.2d at 731). An Alabama court could not exercise specific jurisdiction over Fisher Products because Fisher Products had not directed into Alabama the jack that hit Lagrone. This Court found, however, that an Alabama court could assert general jurisdiction over Fisher Products because its contacts with Alabama were of the type that would cause it to expect to be haled into an Alabama court, and Fisher Products had shipped jacks to 17 Alabama customers, which made Fisher Products' contacts sufficiently "continuous and systematic" that an Alabama court could exercise general jurisdiction over Fisher Products. Lagrone, 839 So.2d at 628. I note that Dill reviewed the suitability of each of 12 Alabama residents to subscribe to the Southwestern offering, thereby "targeting" its actions at Alabama residents on 12 occasions. Under Lagrone, therefore, Dill's behavior could arguably also support an Alabama court's exercise of general jurisdiction over it.
[18] See, e.g., Oetiker v. Jurid Werke, G.m.b.H., 556 F.2d 1, 4 (D.C.Cir.1977)("Section 293 [of the Patent Act, 35 U.S.C. § 1 et seq.,] enabled plaintiff to obtain personal jurisdiction over the foreign defendant with respect to his claims of patent invalidity and noninfringement.... In our view, this enabled plaintiff to obtain personal jurisdiction over the defendant with respect to any of his claims that arose out of the same core of operative fact...."); FS Photo, Inc. v. PictureVision, Inc., 48 F.Supp.2d 442, 445 (D.Del.1999)(holding that when a court may exercise personal jurisdiction over the defendants based on the nationwide service provision in § 27 of the Exchange Act, 15 U.S.C. § 78aa, the court "may exercise personal jurisdiction over all of the defendants ... with respect to the ... state law claims"); Starlight Int'l, Inc. v. Herlihy, 13 F.Supp.2d 1178, 1185 (D.Kan.1998)(holding that when a trial court acquired personal jurisdiction over defendants on securities and RICO, 18 U.S.C. § 1962(c), claims, that court could exercise personal jurisdiction over state-law claims).
[19] "Inaction" actually, because the agreement compelled Miller to forbear from asserting that SMS's transport of Miller constituted an admission of liability.
[20] Dill does not argue in its petition that the transactions at issue do not arise from a common nucleus of operative fact; however, this question was discussed briefly at oral argument. Whether two claims arise from the same nucleus of operative fact can be determined by deciding whether the issues of fact and law raised by the claims are largely the same and whether the same evidence will support or refute the claims. See Desroches v. Ryder Truck Rental, Inc., 429 So.2d 1010 (Ala. 1983). For example, in Penick v. Cado Systems of Central Alabama, Inc., 628 So.2d 598, 600 (Ala.1993), this Court held that claims arising from the same commercial lease agreements arose from a common nucleus of operative fact. Claims arising in this case from the same offering documents, it would appear, arise from a common nucleus of operative fact.
[21] In Ex parte Troutman Sanders, LLP, this Court denied Troutman's mandamus petition on procedural grounds; it did not reach the merits of its argument about forum non conveniens.
[22] I do not address whether an Alabama court could exercise "transient" jurisdiction, or jurisdiction over someone physically present, to reach Dill on the claims brought by the out-of-state parties. See Burnham v. Superior Court of California, 495 U.S. 604, 610, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990)("Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State.").